IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,129






KENNETH VODOCHODSKY, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM KARNES COUNTY






 Keasler, J., delivered the opinion of the Court in which Price, Womack, Johnson,
Holcomb, and Cochran, JJ., joined. Keller, P.J., filed a dissenting opinion. Meyers, J.,
dissented. Hervey, J., did not participate.


O P I N I O N



 In February 2001, a jury convicted Kenneth Vodochodsky of killing a peace officer who
was acting in the lawful discharge of an official duty. (1) Pursuant to the jury's answers to the
special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e),
the trial judge sentenced Vodochodsky to death. (2) Direct appeal to this Court is automatic. (3) 
Vodochodsky raises four points of error. We sustain his second point of error, which alleges
that the evidence is factually insufficient. We reverse his conviction and sentence. 

A. The Victims


 In the early evening hours of October 12, 1999, Atascosa County Sheriff's Deputies
Thomas Monse and Mark Stephenson and Texas Department of Public Safety Trooper Terry
Miller were ambushed and killed by multiple gunshots. Monse died from eighteen gunshot
wounds caused by rifle, shotgun, and handgun fire. Two of his wounds were caused by close
range handgun fire to his face. Stephenson died from eleven gunshot wounds caused by rifle
and handgun fire. Stephenson also had wounds which were caused by close-range handgun fire
to his face. Miller received two wounds from rifle fire. The shot through his head killed him. 
Several other officers involved in the conflict were also injured. 

 At the end of the incident, the shooter, Jeremiah Engleton, killed himself with a gunshot
wound to his head. Near his body lay an SKS Norenco 7.62 x 39mm semiautomatic rifle, a
Mossberg 12-gauge pump-action shotgun, a Ruger 9mm semiautomatic handgun, and a Glock
.40-caliber semiautomatic handgun. The police also found a Lorcin .380-caliber
semiautomatic handgun in Engleton's pants' pocket and a suicide note in his right shoe. 

 Vodochodsky was subsequently indicted for intentionally or knowingly causing
Monse's death by shooting him with a firearm. The indictment further charged that "the said
Thomas Monse was then and there a peace officer . . . who was acting in the lawful discharge
of an official duty, and [Vodochodsky] knew Thomas Monse was a peace officer." At trial, the
jury was instructed on the law of parties and authorized to find Vodochodsky guilty if they
found that he acted "with intent to promote or assist Jeremiah Engleton to commit the offense
of capital murder, and did then and there solicit, encourage, direct, aid or attempt to aid
Jeremiah Engleton to commit the offense . . . ." 

B. The Crime Scene


 Jeremiah Engleton, his wife Violet, their infant daughter, Violet's sister Sara Lopez, her
two children, and her boyfriend Kenneth Vodochodsky (who had been Engleton's friend since
they were small boys) lived in a three-bedroom home in rural Atascosa County just east of
Pleasanton. A thickly overgrown field surrounded by a barbed-wire fence sits to the north of
the residence. Two driveways enter the property. Directly across from one entrance to the
residence, the barbed wire fence had been cut, apparently to facilitate the shooter's movement
between the field and the residence. The field was littered with over a hundred spent rifle and
shotgun casings, and the police found several locations in the field that appeared to be shooting
positions. 

 Monse and Stephenson were gunned down near their vehicles at the north end of the
residence. Miller was shot as he backed his vehicle away from the residence. Others were
wounded as they stood behind Miller's vehicle trying to assess the situation. 

C. The Sequence of Events


 On October 11, 1999, Engleton came home late in the evening and immediately got into
an argument with Violet. He struck her and pointed a gun at her head. Around midnight, in
response to Engleton's violent behavior, Violet called the Atascosa Sheriff's Office, and
Deputy Monse was dispatched to their residence. About the time Monse was exiting his
vehicle, Engleton asked Vodochodsky, "Do you remember what we've been talking about? I'm
going to do it right now." According to Sara, Vodochodsky replied, "No, it's not worth it." 
Monse then arrested Engleton but allowed him to leave Vodochodsky his wallet and $1,000.00
to bail him out the next day. Engleton was booked into jail at 1:10 a.m. on October 12, 1999.

 Later that morning, Engleton commented to his cellmate, Orlando Garcia, that "[t]hese
motherfuckers don't know what they got coming," and that it was going to make the front page. 
Garcia also overheard a telephone call Engleton placed to Vodochodsky, during which
Engleton told Vodochodsky to make sure that Violet did not take his "SK" (an SKS Chinese-
or Russian-made semi-automatic assault rifle) or his "nine" (a 9 millimeter semiautomatic
pistol). Engleton also told cellmate Phillip Darrah that he had been arrested for domestic
violence and that when he got out he "had plans and planned to make some headlines." Darrah
also overheard a telephone conversation between Engleton and Vodochodsky during which
Engleton asked Vodochodsky to take care of his belongings and specifically mentioned the
"SK." Engleton also told Vodochodsky to bring the $1,000.00 he left him to make his bail. 

 While Engleton sat in jail, Sara and Violet moved some of Violet's property into a
storage facility and obtained a restraining order requiring Engleton to vacate the residence by
5:00 p.m. that evening. Shortly after noon, they packed up more of Violet's property and left
for Vodochodsky's parents' house in nearby Floresville.

 At 2:12 p.m., Vodochodsky posted Engleton's bail. Between 3:30 and 4:30 p.m., the
two men went to a Pleasanton gun shop where Engleton purchased several boxes of
ammunition. After that, they returned to their residence. Around 5:30 p.m., Sara called the
house and Vodochodsky told her that Engleton had left. Sara, Violet, and Vodochodsky's
brother Anthony then left Floresville and drove toward the residence. When they arrived, they
saw Engleton's vehicle and continued on to a grocery store in Pleasanton. Sara then called
Vodochodsky again. At first Vodochodsky acted like he was angry because they had not shown
up, but then he dropped his voice to a whisper and told Sara not to come home. Instead, he told
Sara that he would meet her at Anthony's house later. Sara and Anthony left Violet with a
friend and went to Anthony's house. After that, the events occurred in the following order:

7:45 p.m. A neighbor, Edward Essary, drove past Vodochodsky's residence on his way to
Wal-Mart. As he passed the residence, he saw Vodochodsky loading "stuff" into
his vehicle.


8:07 Police received a "911" call to the Atascosa County Sheriff's Office from
Engleton's home. Vodochodsky was still at the residence.


8:13 Monse and Stephenson were dispatched to the residence.


8:28 Monse arrived at the residence and apparently was immediately shot and killed.


8:30 Stephenson arrived.


8:31 Stephenson very faintly radioed in that he had been hit. At approximately this
same time, Vodochodsky's neighbor, Robert Hutton, heard several gunshots. As
he sat in his car at the adjacent intersection, Hutton saw two patrol cars on
Vodochodsky's property with their headlights on. He also noticed that the
security light in the back of the residence was off. Further, Hutton noticed a
flashlight moving on top of Vodochodsky's residence and concluded that a
person was walking around on the roof. He noted that the individual was on the
backside of the pitched roof near the north end of the residence overlooking the
deputies' vehicles. After 45 seconds to a minute, Hutton drove away.


8:37 Miller was dispatched to the residence to check on Monse and Stephenson
because they could not be reached by radio. Also around this time period, but
before Miller arrived at the residence, Essary returned from Wal-Mart. As he
passed Vodochodsky's home, he noticed the two deputies' vehicles in
Vodochodsky's north driveway. After arriving home and putting away his
purchases, Essary became concerned about the events at Vodochodsky's house. 
He then got back in his car and drove toward the house. 


8:51 Miller arrived at the residence.


8:52 Miller radioed in "officer down" and requested assistance. As Miller was
backing away from the residence in his vehicle, he was shot and killed while still
in his vehicle. As Essary approached Vodochodsky's house, he saw a highway
patrol vehicle backing away from the residence and heard gunfire. As Essary
passed the residence, he saw a flashlight on the ground at the north end of the
residence. Essary turned the corner and made his way to another neighbor's
house.


8:56 Pleasanton Police Department Officer Louis Tudyk arrived at the intersection
adjacent to the house. He parked his vehicle behind Miller's vehicle.


8:57 Retired United States Border Patrol Special Agent Carl Fisher pulled his truck
up alongside Tudyk's vehicle.


8:58 Tudyk and Fisher were shot and wounded.


9:00 Vodochodsky arrived at Anthony's house, which is located 21.7 miles from his
own. He told Anthony that he drove straight there from his house, a trip which
should take 21 to 23 minutes depending upon speed and traffic. Vodochodsky
told Sara that Engleton was going to kill himself, and that he wanted to watch the
news. Sara told Vodochodsky that Engleton's suicide would not be on
television. Sara wanted to go to the residence to help Engleton, but
Vodochodsky did not want to go. Over Vodochodsky's objection, Sara called
Violet to tell her that Engleton planned to kill himself. Vodochodsky eventually
agreed to go to the residence. 


10:47 Vodochodsky and Sara arrived at one of the roadblocks attempting to get to the
residence, but they were not allowed through. They then went to pick up Violet
and returned to Anthony's house. After arriving at Anthony's house,
Vodochodsky gave Violet a farewell letter from Engleton. Throughout this time
period, many other officers arrived at the residence and took part in the standoff. 
Finally, with the help of officers in a San Antonio Police Department helicopter,
ground officers pursued Engleton. Before they reached him, Engleton shot
himself in the head and died.


 Either the night of the killings or the next day, October 13, Vodochodsky admitted to
Sara that he was at the residence when the bogus 911 call was made, but he denied making it
himself. Around 2:00 p.m. on October 13, Vodochodsky spoke with Texas Ranger Tony Leal
about the events of the previous day. Vodochodsky told Leal that he left his house at 8:00 p.m.
the previous evening and drove directly to his brother's house in Poteet. Vodochodsky later
told a reporter that he left the house at 7:45 p.m. Vodochodsky also indicated to Leal that he
did not know about Engleton's plans regarding the night of the murders. 

 Around 1:00 p.m. on October 14, Vodochodsky talked to Essary about the killings. 
During this conversation, Essary showed Vodochodsky where he had seen the flashlight the
night of the killings. In response, Vodochodsky stated, "Yeah, that's where one of the pigs -
that's probably where one of the pigs got shot at." Vodochodsky also told Essary that he bailed
Engleton out of jail "[t]o do this." Essary unequivocally told the jury that Vodochodsky made
the statement in a tone that indicated that he was proud of his actions.

 Vodochodsky also told Essary that Engleton wanted to kill the officer that came to
arrest him for assaulting Violet, but Vodochodsky told Engleton, "No, . . . we ain't got nothing
planned yet." Vodochodsky told Essary that Engleton was going to kill himself and "take some
pigs with him." Vodochodsky then stated that "that would be less pigs in the world." 
Vodochodsky told Essary that, after they returned home, Engleton kept four guns and
Vodochodsky loaded the rest in his car as well as some other items "because the police were
coming and he took the stuff that they would confiscate." Along with other weapons,
Vodochodsky also took some tools, the "papers" to the house, and the "papers" to Engleton's
boat. When Essary commented about how the police cut up the fence across the street,
Vodochodsky responded, "No, that's where [Engleton] cut it up" and "that's where he was
shooting at." Vodochodsky further commented to Essary that he knew that Engleton had gone
"over the edge" when he took the deputy's gun. 

 Some time after Vodochodsky was incarcerated, jail personnel found in his possession
a note containing numbers and simple mathematical calculations. Beside one number was the
word "bond" and beside another number was the word "bullets."

D. Analysis


 In his first point of error, Vodochodsky asserts that the evidence is legally insufficient
to support the jury's verdict of guilty of capital murder. In his second point, he asserts that the
evidence is factually insufficient. As previously noted, Vodochodsky was indicted for
intentionally or knowingly causing the death of Thomas Monse, a person he knew to be a peace
officer acting in the lawful discharge of his duty, by shooting him with a firearm. After the
presentation of evidence, the court charged the jury that it could find Vodochodsky guilty if
it found that he acted with the intent to promote or assist Engleton in committing the offense
of capital murder, and Vodochodsky did then and there solicit, encourage, direct, aid or attempt
to aid Engleton in committing the offense. It is well-settled, and Vodochodsky does not
contest the rule, that the law of parties need not be pled in the indictment. (4) Further,
Vodochodsky does not challenge the fact that Engleton intended to kill a peace officer who
was acting in the lawful discharge of his duties. Instead, Vodochodsky contends that he was
merely present at the scene and, therefore, cannot be held responsible for Engleton's acts. 

 In reviewing the legal sufficiency of the evidence, this Court looks at all of the evidence
in the light most favorable to the verdict to determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. (5) In determining
whether evidence is sufficient to convict, we must examine the totality of the circumstances. (6) 
Texas Penal Code § 7.01(a) states that "[a] person is criminally responsible as a party to an
offense if the offense is committed by his own conduct, by the conduct of another for which
he is criminally responsible, or by both." A person is criminally responsible for the conduct
of another if "acting with intent to promote or assist the commission of the offense, he
solicits, encourages, directs, aids, or attempts to aid the other person to commit the
offense[.]" (7)

 The night before the offense, Engleton expressed a desire to "do it right now" and
Vodochodsky told him they did not yet have a plan. A rational jury could conclude from this
evidence that Engleton had a plan to kill a peace officer, that Vodochodsky was aware of
Engleton's plan, and that Vodochodsky wanted to wait until the plan was foolproof. On the day
of the crime, Vodochodsky bailed Engleton out of jail, later telling Essary that he bailed him
out "to do this." A rational jury could conclude from this evidence that Vodochodsky bailed
Engleton out of jail specifically to carry out the plan to kill peace officers. Knowing that the
police were coming and knowing that Engleton intended to commit suicide after his killing
spree, Vodochodsky took many items from the house. A rational jury could conclude from
this evidence that Vodochodsky sought to help Engleton wrap up his affairs as part of his
participation in the plan. Finally, Vodochodsky commented to Essary after the crime that he
knew that Engleton had "gone over the edge" when he took the deputy's gun. A rational jury
could conclude from this evidence that Vodochodsky was still at the residence and witnessed
at least Monse's murder, despite any claims to the contrary. 

 In light of this evidence, we hold that a rational jury could have found beyond a
reasonable doubt that Vodochodsky acted with an intent to promote or assist Engleton in
committing this offense. Point of error one is overruled.

 In a factual sufficiency review, we view all the evidence in a neutral light, both for and
against the finding, and set aside the verdict if "proof of guilt is so obviously weak as to
undermine confidence in the jury's determination, or the proof of guilt, although adequate if
taken alone, is greatly outweighed by contrary proof." (8) In conducting such a review, we
consider all of the evidence weighed by the jury, comparing the evidence which tends to prove
the existence of the elemental fact in dispute to the evidence which tends to disprove it. (9) We
are authorized to disagree with the jury's determination even if probative evidence exists which
supports the verdict, but we must avoid substituting our judgment for that of the fact-finder. (10) 

 In this case, the overwhelming weight of the evidence mitigates against the conclusion
that Vodochodsky solicited, encouraged, directed, aided or attempted to aid Engleton in
committing the offense. All of the evidence that could legally support a rational jury's
conclusion is nevertheless so weak that our confidence in the jury's verdict is undermined. 
When Engleton expressed a desire to "do it right now" and Vodochodsky told him they did not
yet have a plan, neither man specifically mentioned killing a peace officer. When
Vodochodsky told Essary that he bailed Engleton out of jail "to do this," he did not specifically
state that he bailed him out as part of a plan to kill police officers. Vodochodsky removed
belongings from the house, but there is no proof that he did so as part of a murderous plot. 
And Vodochodsky's comment to Essary that Engleton had "gone over the edge" when he took
the deputy's gun could just as reasonably have been a speculative comment, not one indicating
that Vodochodsky had witnessed Monse's murder.

 Indeed, none of that evidence necessarily suggests that Vodochodsky acted with intent
to promote or assist Engleton. None of his statements directly refer to killing police officers.
His statements are devoid of information on the details of the alleged murder plot, and there
is no other information in the record suggesting that Vodochodsky was planning the event with
Engleton. 

 Furthermore, other evidence suggests that Vodochodsky was not working with Engleton. 
His whispered warning to Sara could indicate that while he may have known of Engleton's plan,
he was not a party to it. He did not participate in the purchase of ammunition. There is no
evidence that Vodochodsky actually did any affirmative act to assist Engleton with the plan. 
Instead, Vodochodsky had the bad luck of being the friend and roommate of a man determined
to kill police officers and himself. 

 We conclude that proof of Vodochodsky's guilt was so weak as to undermine
confidence in the jury's determination. This evidence was factually insufficient to convict. 
Point of error two is sustained.

 We reverse the judgment of the trial court and remand this case for Vodochodsky to
answer the charges in the indictment.


DATE DELIVERED: April 21, 2004


PUBLISH
1. Tex. Penal Code Ann. § 19.03(a)(1).
2. Art. 37.071, § 2(g). Unless otherwise indicated this and all future references to
Articles refer to the Code of Criminal Procedure.
3. Art. 37.071, § 2(h).
4. Marable v. State, 85 S.W.3d 287 (Tex. Crim. App. 2002)(and cases cited therein). 
5. Jackson v. Virginia, 443 U.S. 307 (1979); Griffin v. State, 614 S.W.2d 155, 159
(Tex. Crim. App. 1981).
6. See Denton v. State, 911 S.W.2d 388, 389-90 (Tex. Crim. App. 1995); Miller v.
State, 667 S.W.2d 773, 776 (Tex. Crim. App. 1984); Rucker v. State, 599 S.W.2d 581, 591
(Tex. Crim. App. 1979); Reynolds v. State, 506 S.W.2d 864, 867 (Tex. Crim. App. 1974). See
also Garcia v. State, 887 S.W.2d 862, 870 (Tex. Crim. App. 1994).
7. Tex. Penal Code § 7.02(a)(2).
8. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); see also Goodman v.
State, 66 S.W.3d 283, 285-86 (Tex. Crim. App. 2001).
9. Johnson, 23 S.W.3d at 7.
10. Id.; Santellan, 939 S.W.2d at 164.